IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. DWIGHT MOSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-1560 |
| v. | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| CITY OF PITTSBURGH PUBLIC SCHOOL | ) | |
| DISTRICT and CITY OF PITTSBURGH | ) | Doc. Nos. 42 and 50 |
| BOARD OF PUBLIC EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

Lenihan, M.J.

Currently before the Court for disposition are cross-motions for summary judgment. In essence, this civil rights lawsuit involves a facial and "as applied" constitutional challenge to the Pennsylvania Legislature's enactment of an amendment to the Pennsylvania Public School Code on July 20, 2007, codified at 24 Pa. Stat. Ann. 17-1704.1-B. Section 17-1704.l-B appears to eliminate, for management level employees, any entitlement to either a pre- or post-deprivation hearing upon termination of employment. Plaintiff alleges that his summary and precipitous termination from public employment by Defendants on August 23, 2007, without being afforded any due process, including a hearing, the right to counsel, adequate notice of the grounds for termination, or any other appropriate safeguards, violated both the Pennsylvania and United States Constitutions, as well as the Local Agency Law, 2 Pa. Cons. Stat. § 105 and Subch. B of 2 Pa. Cons. Stat. Chs. 5 & 7, and the Pennsylvania Public School Code. In addition to a bringing a claim under 42 U.S.C. § 1983 (Count II), Plaintiff seeks relief in the form of mandamus (Count I), a declaratory judgment under 42 Pa. Cons. Stat. Ann. § 7531 *et seq.* (Count III), and an

Appeal Pursuant to the Local Agency Law (Count IV). Plaintiff also seeks damages in the form of lost wages and benefits, interest, and attorneys' fees, costs and expenses on these claims (Counts I-IV). In addition, Plaintiff seeks mandamus relief under 24 Pa. Stat. Ann. § 11-1164 to recover unpaid fringe benefits that allegedly accrued to his benefit prior to his termination (Count V). Finally, Plaintiff has asserted a claim under the Pennsylvania Whistleblower's Law, 43 Pa.Stat. Ann. § 1421 *et seq*. (Count VI).

This Court has subject matter jurisdiction over Plaintiff's civil rights and federal constitutional claims by virtue of 28 U.S.C. § 1331. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

Defendants have moved for summary judgment (Doc. No. 42) on Counts I, II, III, IV and VI of Plaintiff's Third Amended Complaint. Plaintiff filed a cross-motion for partial summary judgment (Doc. No. 50) with respect to Counts III and IV of his Third Amended Complaint. For the reasons set forth below, the Court will grant Defendants' motion as to Count VI, but will deny it in all other respects. With regard to Plaintiff's cross-motion on Counts III and IV, the Court will grant said motion with respect to Plaintiff's claims for declaratory relief.

## I. FACTUAL BACKGROUND

The parties dispute most of the factual allegations contained in their respective Concise Statements of Material Facts, proffered in support of the cross-motions for summary judgment. Nonetheless, the claims on which the parties seek summary judgment involve either legal questions or factual allegations which are not in dispute. Thus, the Court has gleaned from the parties' submissions the relevant undisputed facts that are material to the questions of law raised in the pending motions, which are summarized below.

Plaintiff, Dr. Dwight Mosley, was hired by Defendants, City of Pittsburgh Public School District and City of Pittsburgh Board of Public Education (collectively, "School District"), on August 6, 2001 for the position of Chief Human Resources Officer. As such, Plaintiff was responsible for overseeing the entire Human Resources Department. Sometime in 2005, while Plaintiff was off on an extended medical leave of absence, the acting superintendent, Dr. Andrew King, presented to the City of Pittsburgh Board of Public Education ("Board") a proposed reorganization of various central office functions, which eliminated three cabinet level positions, including the Chief Human Resources Officer position which Dr. Mosley occupied. (King Aff. ¶ 4 (Pl.'s App. 2).)[1] Upon his return from medical leave, Dr. Mosley was offered the management level position of Director of Staffing and Recruitment, which had been vacant after the reorganization. (*Id.* at ¶ 5; Plaintiff's Second Revised Affidavit dated 8/30/09 ("Pl.'s Aff."), ¶ 7 (Doc. No. 82).) Dr. Mosley occupied the position of Director of Staffing and Recruitment[2] from April 1, 2005 until he was terminated on August 23, 2007.

From November of 2003 to Plaintiff's termination on August 23, 2007, the Office of

---

[1] Dr. King states that the elimination of the three positions was done to improve efficiency and reduce the budget, and he maintains that Dr. Mosley's reassignment was not a demotion nor did it have anything to do with any shortcoming in his performance. (King Aff., ¶¶ 4, 6.) Dr. King further asserts that the Chief Human Resources Officer position did not exist within the School District throughout the period that he was acting superintendent, which he occupied until August of 2005, when Mark Roosevelt assumed the position of superintendent. (*Id.* at ¶¶ 3, 5.) On the other hand, the School District disputes that any such reorganization occurred and that the Chief Human Resources Officer position was eliminated. Rather, the School District unequivocally characterizes Dr. Mosley's reassignment as a demotion, and submits that Lee Nicklos occupied the position of Chief Human Resources Officer position. However, the School District's position with regard to Ms. Nicklos is not supported by the record, as Superintendent Roosevelt appointed Ms. Nicklos as acting chief of human resources *after* he became superintendent in August of 2005. This dispute is not material, however, to determining the outcome of the pending summary judgment motions.

[2] The parties agree that this position is a management position which is above the level of first level supervisor.

Human Resources appears to have been in various states of disorganization and involved in several miscommunications, for which Plaintiff was ultimately held responsible, initially as Chief Human Resources Officer and later as Director of Staffing and Recruitment. Defendants point to several distinct instances where Dr. Mosley's performance was called into question, in attempting to establish a history of unsatisfactory performance. These instances are summarized briefly below.

A December 1, 2003 letter from the superintendent at that time, Dr. John Thompson, to Dr. Mosley indicated that the superintendent and several board members were dissatisfied with Dr. Mosley's job performance and the state of disorganization that existed in the Office of Human Resources in November of 2003. (Pl.'s Dep. Ex. 2, App. Tab B.) In his letter, Dr. Thompson refers to a copy of an improvement plan for Dr. Mosley, the goals of which he expects Dr. Mosley to achieve by December 31, 2003.[3] Dr. Thompson goes on to state that he expects immediate and substantial progress in Dr. Mosley's performance and in the overall operations of the Office of Human Resources, Dr. Mosley to work closely with him to develop an overall solution to the performance problems that confront Dr. Mosley and his office, and his full cooperation in working with an outside consulting group that is developing a reorganization and comprehensive improvement plan for the Human Resources Office. (*Id.*) Finally, Dr. Thompson indicates that he will meet with Dr. Mosley on January 5, 2004 to assess the extent to which he has achieved the goals in the improvement plan and in the event he is unable to attain these goals, Dr. Mosley's future employment with the School District and decisions related to it

[3] Plaintiff disputes that he was placed on an "improvement plan," and instead, insists that he was asked by Dr. Thompson to put together "mission critical issues" that they needed to work on collectively with regard to the Human Resources Office, to show members of the Board that Dr. Thompson was taking affirmative action to address criticisms that various Board members had been directing at him. (Pl.'s Aff., ¶ 5; Pl.'s Dep. at 15-16, App. Tab A.)

will be discussed at that meeting. It appears that the review meeting took place on January 15, 2004, and Dr. Mosley successfully completed all of the items in the improvement plan according to the established timelines. (*See* 1/29/04 Memorandum from Mosley to Thompson, Pl.'s Dep. Ex. 3, App. Tab B.) Dr. Mosley's 2003-04 salary increase, which was not scheduled to go into effect until January of 2004, needed to be authorized by Dr. Thompson before taking effect, which authorization was withheld until Plaintiff successfully completed all of the goals outlined in the improvement plan.[4] (Pl.'s Dep. at 20; Pl.'s Aff., ¶ 6.)

Next, the School District contends that Dr. Mosley was demoted on April 1, 2005 from Chief Human Resources Officer to Director of Recruiting and Staffing, allegedly due to his performance, but fails to provide any details of the conduct that supposedly led to his "demotion." Dr. Mosley, on the other hand, disputes that he was demoted, and submits that his position as Chief Human Resources Officer was eliminated in a reorganization plan implemented by Dr. King while Dr. Mosley was on a medical leave of absence.[5] Dr. Mosley was offered the position of Director of Recruitment and Staffing in April of 2005, which position reported to the Chief Human Resources Officer. The latter position was vacant, however, until Superintendant Roosevelt retained Lee Nicklos, a consultant, to serve as Acting Chief Human Resources Officer from October 2005 to July 2006. Thus, Dr. Mosley reported to Lee Nicklos from October 2005 to July 2006.

During the time that Nicklos was Dr. Mosley's direct report, Nicklos gave him a satisfactory performance rating for his 2006 evaluation, but informed him that the rating included

[4] It appears that Dr. Thompson inadvertently neglected to inform the payroll department that Dr. Mosley's salary increase for 2003-04 had been authorized effective January 1, 2004, until the omission was pointed out to Dr. Thompson by Dr. Mosley in May of 2004. (Pl.'s Dep. at 20 & Ex. 6; Pl.'s Aff., ¶ 6.)

[5] *See* Note 1, *supra*.

a strong emphasis on a need for improvement. (Pl.'s Dep. Ex. 8.) Nicklos issued a supplemental memorandum to the 2006 performance evaluation on June 29, 2006, in which she noted that while "many things have been successfully accomplished during [her]tenure, she outlined nine areas that needed improvement, three of which required Dr. Mosley's immediate attention.[6] (*Id.*)

In September of 2006, Frank Chester became Chief Human Resources Officer, replacing Nicklos, and thus, became Dr. Mosley's supervisor. From approximately October of 2006 to July of 2007, Chester cites numerous instances in which he claims Dr. Mosley's performance was substandard. Dr. Mosley, on the other hand, has a vastly different perception of the incidents upon which Chester graded his performance as substandard. In some of the instances, Dr. Mosley contends he actually assisted in resolving the problem, rather than created the problem, and accuses Chester and the School District of mischaracterizing emails and memorandums detailing outstanding issues that Dr. Mosley's department needed to resolve. The evidence of record is conflicting on many of these factual issues regarding Dr. Mosley's performance and requires credibility determinations. Thus, the Court may not and will not attempt to resolve them on summary judgment.[7] In any event, the factual issue of whether Dr. Mosley's performance was unsatisfactory is not material to the disposition of the pending summary judgment motions.[8]

Of particular relevance to Plaintiff's whistleblower claim is the following incident that occurred in December of 2006, and carried over into the first part of 2007. On December 5,

[6] The three areas that Nicklos identified as needing immediate improvement were: How Dr. Mosley was organized for work; which of his current employees required assistance to do the assigned work; and who may require employee counseling to seek other jobs. (Pl.'s Dep. Ex. 8.)

[7] These factual issues are best left for consideration in the first instance on remand at Plaintiff's due process hearing.

[8] The Court is not being asked to rule on the propriety of the School District's decision to terminate Dr. Mosley, and therefore, whether his performance was unsatisfactory is irrelevant to the pending motions. Rather, what is relevant is what, if any, notice and opportunity to be heard were provided to Plaintiff regarding his termination.

2006, Plaintiff extended an offer of employment to James McCrea for the Electrical Systems Administrator position, based on recommendations of two School District managers. (Memorandum dated 2/22/07 to Jody Spolar from Plaintiff (Pl.'s Dep. Ex. 11).) According to Plaintiff, he gave Mr. McCrea the yellow professional application to complete because McCrea was a new administrator, and historically, the professional application was used for administrators. (*Id.*) That application did not ask McCrea to self-report any prior criminal history. As it turned out, Mr. McCrea had a prior criminal history, which was not discovered until the criminal history background check had been completed, by which time McCrea was already working for the School District. McCrea subsequently resigned. Frank Chester, Dr. Mosley's supervisor, felt that Dr. Mosley provided the incorrect application packet to Mr. McCrea[9] and failed to conduct the criminal background check in a timely fashion. (Memorandum dated 3/6/07 from Chester to Dr. Mosley's personnel file (Pl.'s Dep. Ex. 12).)[10] Consequently, Chester placed a memorandum in Dr. Mosley's personnel file on March 6, 2007, reflecting his alleged mishandling of the situation, and the need for attention to detail and follow-through. (*Id.*)

In response to Chester's March 6, 2007 memorandum, Dr. Mosley sent a rebuttal letter to

---

[9] It was felt that Dr. Mosley should have provided Mr. McCrea with the non-professional (*i.e.*, non-teaching) employee application packet, which form requires the applicant to self-report any prior criminal history. (Pl.'s Dep. Ex. 11 & 12.) Under the Public School Code, "professional employee" refers to those employees "who are certificated as teachers, supervisors, supervising principals, principals, assistant principals, vice-principals, directors of vocational education, dental hygienists, visiting teachers, home and school visitors, school counselors, child nutrition specialists, school librarians, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists and school nurses." 24 Pa. Stat. Ann. § 11-1101(1). Thus, any employee who does not fall into one of the enumerated certificated categories would be considered a non-professional employee.

[10] Jody Spolar and Frank Chester appear to contend that had the non-professional application been provided to McCrea, his criminal history would have been discovered much sooner. (Pl.'s Dep. Ex. 11 & 12.)

Chester on March 19, 2007, to inform the School District about his belief that he was being criticized and blamed for failing to obtain the appropriate background checks in December 2006, and alleged that other employees failed to obtain timely background checks for Chester and Superintendant Roosevelt.[11] (Letter dated 3/19/07 from Dr. Mosley to Frank Chester (Pl. Dep. Ex. 13).) Subsequently, Chester investigated Dr. Mosley's allegations, filed a background check report for himself, and confirmed that Superintendant Roosevelt's background checks were already completed and located in his personnel file. (Chester Dep. at 13-14, 21-22, 29.)

Thereafter, on April 3, 2007, Chester completed an Employee Performance Appraisal System Employee Improvement Plan for Dr. Mosley ("EIP"). (Pl.'s Dep. Ex. 16.) The EIP identifies the following areas of concern relating to performance: "Planning and implementation, timeliness, problem solving, decision making". (*Id.*) With regard to improvement strategies and expected areas of improvement, the EIP states "see attached", however, there is nothing attached to the copy of the EIP included in the record. On April 12 and 19, 2007, Dr. Mosley and Chester met to discuss the items identified on the form entitled "Action Items for Recruiting and Staffing" (Pl.'s Dep. Ex. 19), which focused on tasks, expected outcome, timeframe for completion and results. On April 24, 2007, Plaintiff was asked to review and sign a copy of the EIP. (Pl.'s Dep. Ex. 20 & 21.) In response, Dr. Mosley emailed Chester on April 26, 2007 requesting a meeting with him to discuss the implications of being placed on an EIP, and that a representative of the Pittsburgh Administrators Association ("PAA") be

---

[11] The parties disagree about Chester's reaction to the information in the letter. Dr. Mosley contends that when he first mentioned the issue to Chester sometime prior to March 19, 2007, he became visibly irate, while Chester maintains that he thanked Dr. Mosley for pointing out a potential problem. (Pl.'s Aff., ¶ 33; Chester Dep. at 13.) In addition, a copy of Dr. Mosley's rebuttal letter was not placed in his personnel file, despite a request to do so, nor did Chester inform the Superintendant or any Board members about Dr. Mosley's letter. (Chester Dep. at

present at the meeting. (*Id.*) A meeting was subsequently held between Chester, Dr. Mosley and Vincent M. Carr, the PAA representative in April of 2007. Although there is some disagreement over what was said at the meeting, the parties do appear to agree that Chester indicated at the meeting that Dr. Mosley was not on an improvement plan and that he was not in any danger of being terminated. (Pl.'s Dep. at 65; Affidavit of Vincent M. Carr dated 5/2/07 ("Carr Aff."), ¶ 6 (Pl.'s App. Ex. 5 (Doc. No. 68-5)); Chester Dep. at 94-98; Supplemental Declaration of Frank Chester ("Chester Supp. Decl."), ¶ 4 (Defs.' Supp. App. II, Tab H (Doc. Non. 71-2)).)

In a Memorandum dated May 25, 2007, Chester again confirmed with Dr. Mosley that the Recruiting and Staffing Department was not operating at an acceptable level, and that he needed to focus on the critical areas highlighted in a three-month project plan. (Pl.'s Dep. Ex. 24.) In another Memorandum dated June 20, 2007, Chester informed Dr. Mosley of his decision to implement a number of changes in the organization of the Recruiting and Staffing Department. (Pl.'s Dep. Ex. 26.) One of the changes that Chester implemented was a realignment of personnel, which relieved Dr. Mosley of all responsibility for Board/Personnel related areas. (*Id.*)

Sometime after the June 20, 2006 Memorandum but prior to August 17, 2007, Chester recommended Plaintiff's termination to the Superintendant based upon continuing problems they were experiencing in the staffing and customer service areas, inaccuracies in records and information provided to the Board, union grievances, and summer school staffing, all of which he attributed to Dr. Mosley.[12] (Chester Dep. at 117-121.) The Superintendant concurred with

---

21-24, 26.)

[12] Dr. Mosley strongly disputes the reasons for his termination, and proffers evidence that raises both credibility issues and issues of fact. The Court offers no opinion as to the veracity of

Chester's observations about Plaintiff's unsatisfactory performance. (Chester Dep. at 115; Deposition of Mark Roosevelt dated 3/30/09 ("Roosevelt Dep.") at 35-36, 42-43, 45-46 (Pl.'s App. 7 (Doc. No. 68-7)).) Consequently, on August 17, 2007, Superintendant Roosevelt signed a letter written to Dr. Mosley, in which he advises Dr. Mosley that he is recommending to the Board that he be dismissed as Director of Recruiting and Staffing and his employment terminated based on unsatisfactory performance. (Pl.'s Dep. Ex. 31; Roosevelt Dep. at 50.) Superintendant Roosevelt further advises Dr. Mosley that his recommendation was being made pursuant to Section 17-1704.1-B of the Pennsylvania Public School Code as it relates to Commonwealth Partnership Districts. (Pl.'s Dep. Ex. 31.) In support of his recommendation, Superintendant Roosevelt points to Dr. Mosley's overall performance, specifically:

- Failure to adequately interact with and supervise [his] staff
- Poor decision making and problem solving that has negatively impacted grievances, employee relations issues, and credibility with the Board
- Numerous deficiencies in the performance of [his] duties and the administration of [his] department relating to the summer school program
- Lack of detail and analysis of issues

(*Id.*) The August 17, 2007 letter further states:

> Many of these matters were reviewed by Lee B. Nicklos in her review of your performance in June, 2006 with no demonstrable improvement on your part. Dr. John Thompson noted similar issues in his letter to you in December, 2003, that ultimately led to your demotion and placement in this position. Nothing in your performance changed materially for the better.

(*Id.*) Finally, Superintendant Roosevelt indicates that the Board will consider his recommendation on August 22, 2007, and if the Board adopts his recommendation, the action

Chester's reasons for terminating Plaintiff, but notes only that these were the reasons proffered by him.

will be final. (*Id.*) Although the letter is dated August 17, 2007, it was postmarked August 20, 2007 (*id.*), and was received by Dr. Mosley on the evening of August 21, 2007 (Pl.'s Dep. at 89-90; Pl.'s Aff., ¶51).

Dr. Mosley did not go to work on August 22, 2007. (Pl.'s Dep. at 93.) Prior to the Board meeting, Dr. Mosley made telephone calls from home to discuss the August 17, 2007 letter with the following individuals: His attorney, Avrum Levicoff; three members of the Board—Mark Brently, Tom Sumpter, and Randall Taylor; PAA Representative Vince Carr; PAA legal counsel Susan Halstal; and Sharon Ward, who handled fringe benefits information at the School District. (Pl. Dep. at 93-96; Pl.'s Dep. Ex. 34.) Plaintiff's counsel, Avrum Levicoff (who represented Dr. Mosley in a prior School District matter), faxed a letter to the Superintendant on August 22, 2007, prior to the Board meeting, claiming that the Superintendant's position was unfounded. (Defs.' App. Tab F (Doc. No. 45-7).) Mr. Levicoff's letter indicates that he copied the Board President, William Isler, on the letter. (*Id.*)

Prior to the Board meeting, Plaintiff was also able to talk with Board members Mark Brently and Tom Sumpter, during which he inquired if they knew what was going on. (Pl.'s Dep. at 94-95.) According to Dr. Mosley, neither Board member was aware of what was going on with Dr. Mosley's termination. (Pl.'s Dep. at 95.) Dr. Mosely also spoke with Sharon Ward regarding the number of benefit days that he had accrued, in the event he was going to be terminated. (Pl.'s Dep. at 95.) In addition, Plaintiff spoke with Vince Carr to find out what rights he had from the union's perspective. (Pl.'s Dep. at 96.) Carr referred Plaintiff to PAA legal counsel, Susan Halstal, who informed Dr. Mosley that he had some legal coverage. (*Id.*)

On August 23, 2007, Dr. Mosley reported to work and shortly thereafter, security guards appeared at his office to escort him from the building. (Pl.'s Dep. at 97-98; Pl.'s Dep. Ex. 34.)

Also on that date, Chester wrote to Dr. Mosley to inform him that the Board voted to dismiss him from his position effective August 23, 2007. (Pl.'s Dep. Ex. 32.) The letter does not mention any rights, procedures, or appeals available to Plaintiff.[13]

Subsequently, Dr. Mosley instituted the present action on September 21, 2007, in the Allegheny County Court of Common Pleas, alleging violations of state law. On November 5, 2007, Mosley filed a Second Amended Complaint, adding a Section 1983 claim. Consequently, Defendants removed the case on November 15, 2007 to this Court based on 28 U.S.C. §§1441(a) and 1331. After Plaintiff's motion for remand and Defendants' motion to dismiss were denied, discovery ensued and after completion, the parties have now moved for summary judgment. The motions have been fully briefed and are ripe for disposition.

## II. STANDARD OF REVIEW – CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been

[13]Other than Dr. Thompson's December 1, 2003 Memorandum to Dr. Mosley, none of the other documents of record show that Plaintiff was told that his continued employment was in jeopardy as a result of any performance issues. Post 2003, the first indication Dr. Mosley had that his employment might be terminated came when he received Superintendant Roosevelt's August 17, 2007 letter on August 21, 2007, the evening before the Board meeting at which his termination

met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by Matsushita Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

## III. DISCUSSION

The School District has moved for summary judgment on all counts except Count V – Mandamus regarding unpaid accrued fringe benefits. Dr. Mosley has filed a cross-motion for summary judgment as to Counts III and IV, and requests a determination by the Court that the 2007 amendment to the Pennsylvania Public School Code, 24 Pa. Stat. Ann. 17-1704.1-B(a)-(e), is facially unconstitutional and unconstitutional as applied. Because the resolution of the

---

was being recommended by the Superintendant.

constitutional issues is dispositive of all the counts upon which the parties have moved for summary judgment except for the Pennsylvania Whistleblower Law claim under Count VI, the Court turns first to the constitutional arguments.

### A. Dr. Mosley's Constitutional Claims

Dr. Mosley submits that the School District terminated his employment without affording him any process, relying on 24 Pa. Stat. Ann. § 17-1704.1-B, which authorizes Commonwealth Partnership School Districts, of which the City of Pittsburgh School District is one, to summarily terminate the employment of "management employees" without affording such employees the due process protections previously mandated by the due process clauses of both the United States and Pennsylvania Constitutions, and more explicitly by the provisions of the Pennsylvania Public School Code.

Section 17-1704.1-B provides:

> (a) The superintendant of a school district shall have the authority to recommend to the board of school directors dismissal of a management employe for unsatisfactory performance or wilful misconduct.
>
> (b) The board of school directors shall consider a recommendation of the superintendent for dismissal of a management employe. A recommendation for dismissal of a management employe shall be subject to the provisions of [24 Pa. Stat. Ann. § 5-508].[14]
>
> (c) The action of the board of school directors in dismissing an employe under this article shall not be deemed an adjudication under 2 Pa. C.S. Ch. 5 Subch. A (relating to practice and procedure of Commonwealth agencies), nor shall it be subject to a hearing under [24 Pa.Stat.Ann. §§ 5-514, 11-1125.1, & 11-1122].

[14] Section 5-508 requires an affirmative vote of the majority of all the members of the board of school directors to take action on certain enumerated subjects, and specifically mentions the dismissal of superintendents, assistant or associate superintendents, principals and teachers. However, none of classes of employees mentioned in § 5-508 includes management employees such as Dr. Mosley.

(d) For the purposes of this section:

(i) The term "management employe" shall mean an employe who holds a management position above the level of first level supervisor. This term shall not include a principal, assistant principal, vice principal or any position requiring a certificate from the Secretary of Education.

(ii) The term "school district" shall mean a school district that has been designated by the Secretary of Education as a Commonwealth partnership school district.

(e) This section shall expire December 31, 2009.

24 Pa. Stat. Ann. § 17-1704.1-B (2007). Section 17-1704.1-B was added as part of omnibus amendments to the Pennsylvania Public School Code on July 20, 2007, and went into effect immediately. H.R. 842, 191st Gen. Assem., Reg. Sess. (Pa. 2007), 2007 Pa. Legis. Serv. Act 2007-45 (West).

In the case at bar, Dr. Mosley concedes that Section 17-1704.1-B, as written, does authorize the School District to have terminated his employment without a hearing or other due process protections, but argues that the statute is unconstitutional on its face and as applied to him. In particular, Dr. Mosley contends that Section 17-1704.1-B is unconstitutional on its face because it both creates a property right and, at the same time, authorizes an impairment of that property right, thus, denying due process. In addition, Plaintiff submits that Section 17-1704.1-B is unconstitutional as applied to him because the School District relied on the statute when the carried out his termination.

In response, the School District argues that the Court need not address the validity of Section 17-1704.1-B, and in support, points to the precept that generally, courts will refrain from deciding the constitutionality of a statute unless such adjudication is unavoidable. *Egolf v.*

*Witmer*, 526 F.3d 104, 109 (3d Cir. 2008). The School District maintains that because Dr. Mosley either (1) had no protectable property interest, or (2) if he had a protectable property interest, he was provided with sufficient due process, and thus, there is no need to pass on the statute's validity. Moreover, the School District submits that if the process provided to Dr. Mosley was not legally sufficient, then that goes to the issue of the process actually provided and not the statute's validity.

**1. Property Interest in Continued Employment**

In order to establish a procedural due process claim, a Plaintiff must demonstrate that "'(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.''" *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 219 (3d Cir. 2009) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000))). Thus, as a threshold matter, Dr. Mosley must establish that he had a property interest in his employment with the School District.

In order to establish a property interest in employment, an employee must "have a legitimate claim of entitlement to it." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . ..'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Roth*, 408 U.S. at 577) (other citation omitted).

As this Court found in its earlier opinion on Defendants' Motion to Dismiss, Section 17-1704.1-B "does confer a property interest to management employees, as their termination must

be for cause, *i.e.*, unsatisfactory performance or willful misconduct." *Mosley v. City of Pittsburgh Public Sch. Dist.*, Civ.A.No. 07-1560, 2008 WL 2224888, at *10 (W.D.Pa. May 27, 2008). The parties have not pointed to any facts or case law that would cause this Court to change its ruling.

The School District contends that Section 17-1704.1-B effectively removed any claim to tenure by eliminating the statutory "for cause" reasons, and by stating that a management employee's discharge is not an adjudication. Therefore, the School District contends that Plaintiff was an at-will employee and had no legitimate claim of entitlement to continued employment. Contrary to the School District's contention, the Court finds that Section 17-1704.1-B does not eliminate the statutory "for cause" reasons.

If the real objective of the Pennsylvania legislature in enacting Section 17-1704.1-B was to provide school boards with a streamlined process for removing management employees, as the School District suggests, then why did it predicate removal on unsatisfactory performance or willful misconduct? Interestingly, the original version of the bill included a provision in subsection (c) of Section 17-1704.1-B that required notice and a hearing in compliance with Section 5-514, similar to the final version of subsection (c)(4) of Section 17-1704-B pertaining to school administrators.[15] *See* Pa. Sen., An Act Amending the Act of March 10, 1949 (P.L. 30, No.

[15] From July 20, 2007 until December 31, 2009, Section 17-1704.1-B authorizes a streamlined termination process for management employees, under the authority of the Education Empowerment Act. Enacted in 2000, the EEA vests school districts, who have been determined to be either academically or financially distressed, or both, with certain powers to improve academic performance and reduce fiscal and administrative burdens. *See* 24 P.S. §§ 1701-B to 17-1716-B. In so doing, school boards can circumvent previously applicable statutory and/or administrative procedures with regard to certain enumerated actions. 24 P.S. § 17-1704-B. Unlike Section 17-1704.1-B, which applies to management employees, Section 17-1704-B(c)(4), which applies to school administrators, requires that notice and an opportunity to be heard, as provided under the Local Agency Law, be afforded to a school administrator who is dismissed by the school board based on an unsatisfactory review and evaluation.

14), known as the Public School Code of 1949, H.B. 842, 191st Gen. Assem., Reg. Sess., No. 50 of 2007, at 836 (June 29, 2007). However, in the final version of Section 17-1704.1-B, the legislature eliminated the language requiring notice and hearing and instead, specifically stated that such process was not applicable to management employees. No explanation for this revision appears in the discussion on the bill.

A close reading of Sections 17-1704.1-B(a) and (c) reveals that it does not repeal or amend the property right created in Section 5-514. Rather, subsections (a) and (c) authorize a school superintendent to recommend to the school board the dismissal of a management employee for unsatisfactory performance or willful misconduct, without the due process provided for under the Local Agency Law or a hearing as provided under Section 5-514. By specifically stating in subsection (c) that the school board's action is not subject to *a hearing under Section 5-514*, this language suggests that the legislature intended to otherwise leave Section 5-514 intact, so that the other aspects of Section 5-514 still apply to management employees, such as the requirement that management employees can only be removed for one of the specifically enumerated reasons, *i.e.*, incompetency, intemperance, neglect of duty, violation of any Pennsylvania school laws, or other improper conduct. 24 Pa. Stat. Ann. § 5-514.

The reason given for Dr. Mosley's termination, unsatisfactory performance, although not one of the specifically enumerated categories of conduct under Section 5-514, certainly is encompassed within one of more of the enumerated categories of conduct. Thus, this Court does not construe the statute as eliminating the "for cause" reasons in recommending the dismissal of a management employee under Section 17-1704.1-B, based on both the statute's plain language and its legislative history.

Having determined that the statute does not eliminate the "for cause" reasons for

dismissing a management employee, the Court recognizes that precedent exists in both Pennsylvania and federal law for finding a protectable property interest in continued employment where a statute provides that an employee can only be terminated for cause. *See, e.g.*, *Lewis v. Sch. Dist. of Philadelphia*, 690 A.2d 814, 817 (Pa. Commw. Ct. 1997) (holding that "non-professional public school employees have a property right in their expectation of continued employment, as defined in Section [5-]514, and the Board must comply with procedural due process safeguards when dismissing them for cause.") (citations omitted); *Loudermill*, 470 U.S. at 538-39 (finding Ohio statute that allowed civil service employees "to retain their positions during good behavior and efficient service, [and] who could not be dismissed 'except . . . for . . . misfeasance, malfeasance, or nonfeasance in office," *i.e.*, for cause, created a protectable property interest); *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997) (recognizing its previous holding that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process") (citing *Roth*, 408 U.S. at 578; *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972)). Because Section 17-1704.1-B(a) provides that a superintendent may recommend to the school board the termination of a management employee for unsatisfactory performance or willful misconduct, the Court finds this limitation is the equivalent of a termination for cause, and thus, holds that the statute gives Dr. Mosley a constitutionally protected property interest in his former position with the School District.

**2. What Process is Due Under the Circumstances**

Having concluded that Dr. Mosley possesses a constitutionally protected property interest, the Court must next determine what process was due under the circumstances. As the Supreme Court has emphasized:

> [T]he Due Process Clause provides that certain substantive rights-life, liberty, and property-cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett v. Kennedy, supra*, 416 U.S., at 167, 94 S.Ct., at 1650 (POWELL, J., concurring in part and concurring in result in part); see *id*., at 185, 94 S.Ct., at 1659 (WHITE, J., concurring in part and dissenting in part).
>
> In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

*Loudermill*, 470 U.S. at 541. As in *Loudermill*, the answer to the question, what process is due, is not found in the state statute, in this case, Section 17-1704.1-B.[16]

The essential elements of due process are notice and an opportunity to be heard in a meaningful manner and at a meaningful time under the circumstances. *Loudermill*, 470 U.S. at 542 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations omitted). The Supreme Court has "described the 'root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'"[17] *Loudermill*, 470 U.S. at 542 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (emphasis in original) (other citation omitted). In the context of a constitutionally protected

---

[16] As explained below, subsection (c) of Section 17-1704.1-B eliminates, rather than provides, due process for management employees terminated for unsatisfactory performance or willful misconduct.

[17] The Supreme Court noted, however, that a post deprivation hearing will satisfy due process

property interest in continued employment, the Supreme Court has held that due process requires "some kind of a hearing" prior to an employee's discharge. *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. at 569-70; *Perry v. Sindermann*, 408 U.S. at 599). Recently, the United States Court of Appeals for the Third Circuit aptly summarized the law regarding due process in a similar factual situation:

> However, "[i]t is by now well established that ' "due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Id.* (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). For instance, the Supreme Court has " 'rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property.' " *Id.* (emphasis and alteration in original) (quoting *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). "Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citing *Arnett v. Kennedy*, 416 U.S. 134, 167-68, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part)).

*Biliski*, 574 F.3d at 220 (footnote omitted).

In *Mathews v. Eldridge*, the Supreme Court delineated three distinct factors that must be considered in determining what process is sufficient in a particular situation: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function

---

requirements in some situations. *Loudermill*, 470 U.S. at 542 n. 7 (citations omitted).

involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335 (citation omitted). In weighing these factors, the court of appeals provided the following guidance in a situation involving the dismissal of a public employee:

> In *Loudermill*, the Supreme Court held that a "pretermination 'hearing' ... need not be elaborate," but "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 545-46, 105 S.Ct. 1487. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 546, 105 S.Ct. 1487. Moreover, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id*. at 545, 105 S.Ct. 1487 (alteration in original). "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id*. (quoting *Mathews*, 424 U.S. at 343, 96 S.Ct. 893). *Loudermill* addresses the contours of pre-deprivation procedural requirements in a factual scenario where the plaintiff, a "tenured public employee," had been provided a post-termination hearing. 470 U.S. at 546, 105 S.Ct. 1487.

*Biliski*, 574 F.3d at 220-21.

In the case at bar, the School District contends that even if this Court finds that Dr. Mosley possesses a property interest in continued employment, it provided all the process that was due to Plaintiff after weighing the *Mathews* factors. With regard to the first factor, the School District acknowledges that its decision to terminate Dr. Mosley affected his private interest in continued employment. As to the second factor, the School District submits that because Section 17-1704.1-B does not set a standard for the decision-making process, but only requires a recommendation by the Superintendent of unsatisfactory performance, that demonstrates that the Pennsylvania legislature purposely set a wide, subjective standard to

empower troubled districts to make prompt personnel decisions.[18] The School District further submits that Dr. Mosley was routinely put on notice of his unsatisfactory job performance from the numerous verbal and written reprimands and counseling that he received while employed by the School District, and that his substandard performance is not disputed. The School District thus maintains that "there is simply no risk that the Superintendent's recommendation or the Board's vote was 'erroneous' in the *Matthews* sense as [Plaintiff's] record of unsatisfactory performance was beyond dispute." Brief in Supp. of Defs.' Mot. for Summ. J. (Doc. No. 43) at 10. In any event, the School District contends that an "informal" hearing would not produce a fact that altered the history of the School District's assessment of Plaintiff's performance. In support, the School District relies primarily on *Biliski v. Red Clay Consolidated School District Board of Education*, 574 F.3d 214 (3d Cir. 2009). Finally, as to the third *Mathews* factor, the School District contends that Section 17-1704.1-B was added under the Education Empowerment Act, which was enacted by the General Assembly to address the needs of troubled school districts, like the Pittsburgh Public School District. P.L. 44, No. 16, § 8.1 (as amended 24 Pa. Stat. Ann. §§ 17-1701-B to 17-1716-B). The School District further contends that Section 17-1704.1-B assists it in efficiently removing unsatisfactory employees without incurring additional fiscal or administrative burdens. According to the School District, in light of the *Mathews* factors, the School District's compliance with Section 17-1704.1-B affords Dr. Mosley all the due process to which he is entitled.

In response, Dr. Mosley asserts that *Loudermill* "lays thoroughly asunder the School District's abysmal and misdirected attempt in its Brief to analyze the 'Matthews" factors,'. . .

---

[18] The Court was unable able to find any support for this statement in the legislative history. Indeed, the Court could not find any discussion regarding proposed Section 17-1704.1-B in its review of the General Assembly sessions discussing H.B. 842.

[and] shows how these factors should *properly* be considered in an employment discharge case." Pl.'s Consol. Mem. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Motion for Partial Summ. J. (Doc. No. 52) at 22-23. Dr. Mosley also submits that *Biliski* is factually distinguishable from the case at bar and thus does not support the School District's position.

Applying the interest balancing framework to the facts here, the Court concludes that the process Dr. Mosley received was wholly inadequate. First, Dr. Mosley's private interest in his continued employment is significant. The Supreme Court has frequently recognized the severity of depriving a person of the means of his livelihood. *Gilbert*, 520 U.S. at 932 (citing *Loudermill*, 470 U.S. at 543) (other citation omitted). "While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Loudermill*, 470 U.S. at 543 (citing *Lefkowitz v. Turley*, 414 U.S. 70, 83-84 (1973)).

The second factor in the *Mathews* balancing test, and the one most critical to this case, is the risk of erroneous termination through the process used. Given the lack of process afforded to Dr. Mosley, this factor weighs heavily in his favor. Prior to July 20, 2007, the procedures under Section 5-514 and the Local Agency Law, which require due notice, including the reasons for termination, and a hearing if demanded, applied to management employees terminated for cause. Although the record contains evidence that Dr. Mosley was asked to improve his or his department's performance in certain areas beginning in November of 2003, he never received an formal unsatisfactory performance evaluation. In addition, other than Dr. Thompson's December 1, 2003 letter, Dr. Mosley was never told that his performance was at a level that he was in jeopardy of being terminated, until he received Superintendent Roosevelt's August 17, 2007 on the evening of August 21st. Moreover, the record also reveals that many of the alleged

problems with Dr. Mosley's performance cited by the School District are contested by Plaintiff as either (1) not attributable to him or (2) mischaracterized as a problem, when allegedly no problem existed. Thus, contrary to the School District's assertion, issues of material fact, as well as credibility issues, exist as to whether Plaintiff's performance was, indeed, unsatisfactory. Thus, the School District's argument that there is no risk that the Superintendent's recommendation or the Board's vote was erroneous is disingenuous and contrary to the record evidence. Moreover, it is highly likely that if the Dr. Mosley is afforded a post-deprivation hearing to present his side of the story, along with any supporting evidence and witnesses, the risk of erroneous deprivation will be greatly reduced.

Finally, as to the third *Mathews* factor, the School District has an equally significant interest in efficiently removing management employees whose performance is unsatisfactory, or who engage in willful misconduct. Moreover, as a Commonwealth Partnership School District in 2007, the School District had a significant interest in improving the academic performance of its students while reducing the fiscal and administrative burdens associated with managing its business affairs. 24 Pa. Stat. Ann. § 17-1704-B. In light of the fact that the process owed to Dr. Mosley is the same as that afforded to management employees under Section 5-514, by requiring the School District to afford Dr. Mosley the notice and hearing contained in Section 5-514, the additional fiscal and administrative burden will be minimal.

*Loudermill* instructs that a tenured public employee, such as Dr. Mosley, prior to termination, should be given oral or written notice of the charges against him, an explanation of the evidence against him, and an opportunity to present his side of the story at something less than a full evidentiary hearing. Dr. Mosley was provided neither adequate notice nor any opportunity to be heard either before or after the School Board's action.

The notice provided to Dr. Mosley through the Superintendent's August 17, 2007 letter, which was postmarked August 20th and received by Dr. Mosley on August 21st after work, notifying him that the Board was meeting the next day to act on the Superintendent's recommendation of dismissal, was wholly inadequate. "Notice is sufficient, 1) if it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir. 1986) (citing *Loudermill*, 470 U.S. at 545-46). In *Gniotek*, the court of appeals held that advanced notice of the pretermination hearing was not required because, as in *Loudermill*, the appropriate balance was struck "by allowing the government to dismiss the employee after only a compressed hearing and by guaranteeing to the employee 'an opportunity to present his side of the story' followed by a prompt and complete post-termination hearing." *Gniotek*, 808 F.2d at 244-45. In contrast here, Dr. Mosley was afforded little or no advanced notice, and no pre- or post-deprivation hearing. The Court finds this is constitutionally insufficient under the circumstances, especially where there are disputed factual issues regarding the grounds for Dr. Mosley's dismissal. Moreover, there is nothing in the record to suggest that there was an urgency to removing Dr. Mosley. If, as the School District asserts, Dr. Mosley had a five-year history of unsatisfactory performance, having waited that period of time to decide to terminate him indicates the need to remove him was not so urgent that it could not give him at least meaningful notice. Less than twenty-four hours notice was not adequate for Dr. Mosley to present his side of the story.

Moreover, the School District's reliance on *Biliski* to support its argument that Dr. Mosley received adequate notice, is misplaced. The School District's position is that because Dr. Mosley received written and oral criticisms and reprimands regarding the same performance

problems which formed the basis of the recommendation to terminate him, over the six years he was employed by the School District, Dr. Mosley received constitutionally adequate notice. However, *Biliski* is distinguishable factually from this case in several respects.

First, Mr. Biliski, a computer tech for the school district, received five disciplinary memos for poor work performance and inappropriate behavior over a 4 ½ month period. He was specifically warned in the memos that he could face termination if his conduct continued. The memos cited specific instances of inappropriate or unsatisfactory conduct. These memos were given to Mr. Biliski at face to face meetings. 574 F.3d at 221-22. By contrast here, Dr. Mosley was only told once, over his six-year tenure at the School District, on December 1, 2003, more than 3 ½ years before he was terminated, by Dr. Thompson that he could face possible termination if he did not meet the goals established in the improvement plan for his department by the end of the year. Dr. Mosley successfully completed all of the goals in a timely fashion and Dr. Thompson subsequently authorized the release of his salary increase effective January 1, 2004. At no time after that was Dr. Mosley ever told that he was in jeopardy of being terminated, for any reason, let alone, unsatisfactory performance. Indeed, in an April 2007 face to face meeting with Chester, Dr. Mosley was assured he was not in danger of being terminated. Thus, unlike *Biliski*, the memos and oral criticisms Dr. Mosley received do not provide the required constitutional notice.

Second, when Mr. Biliski contacted the members of the school board, he was told by the board president he could submit a letter refuting the charges. The court of appeals held that Mr. Biliski, who had been given written notice on August 8th, had enough notice to, and did prepare a detailed and lengthy written response to the charges in advance of the August 16th board meeting. 574 F.3d at 222. Here, Dr. Mosley was not even given even one day's notice, let alone

an opportunity to respond either orally or in writing, either before or after the Board meeting.

Moreover, the board in *Biliski* had the benefit of Mr. Biliski's fifteen-page rebuttal, which it considered at its meeting, prior to voting to terminate him. Thus, the court of appeals determined that there was little or no risk of an erroneous deprivation of a property interest under the second *Mathews* factor. *Id.* at 223. The court of appeals further found that because Mr. Biliski did not dispute that the conduct for which he was terminated occurred, the board had ample reasons to dismiss him and it failed to see how a more elaborate pre-termination proceeding or an oral post-termination hearing would have led to a different result. *Id.* In the case at bar, the risk of erroneous deprivation is substantially higher, as the Board did not have the benefit of a detailed written response from Dr. Mosley when it acted to terminate him.[19] In addition, Dr. Mosley has supported his opposition to Defendants' summary judgment motion with evidence showing that the bases for his termination are strongly disputed, raising an issue of fact as to whether the Board actually had cause for terminating Dr. Mosley. Under these vastly different circumstances, this Court finds the court of appeals' decision in *Biliski* is inapposite and thus does not support a finding that Dr. Mosley received constitutionally sufficient notice.

Therefore, in light of the above reasoning, the Court finds that Dr. Mosley is entitled to a hearing that complies with the requirements of the Local Agency Law.[20] Accordingly, the Court will enter an order vacating the Board's action terminating Dr. Mosley, and remanding this

---

[19] To the extent the School District attempts to argue that the letter from Plaintiff's counsel faxed on August 22, 2007, the day of the Board meeting, constitutes a response to the allegations against him, its argument is unavailing. It is clear from reviewing the letter that it was drafted in an expeditious manner to voice an objection and hopefully postpone the decision to allow time for a meaningful response. Nor does counsel's letter address the substantive merits of the charges against Dr. Mosley. To suggest otherwise is disingenuous.

[20] The appropriate remedy here, where a school board has taken a personnel action without affording the required hearing, is to remand for a hearing, not reinstatement. *Foster v. Bd. of Sch. Directors of Keystone Oaks Sch. Dist.*, 678 A.2d 1214, 1218 (Pa. Commw. Ct. 1996)

matter to the Board to give Dr. Mosley a hearing after due notice thereof. The Court declines, however, to address Plaintiff's claims for money damages at this time, as those claims for relief are intertwined with and dependent upon the Board's determination of the propriety of Dr. Mosley's termination. Plaintiff may pursue his damage claims before this Court, if necessary, after the Board issues its determination, upon remand and after a hearing.

### 3. Facial vs. As Applied Challenge to Section 17-1704.1-B

Dr. Mosley contends that Section 17-1704.1-B is unconstitutional on its face because it both creates a property right and, at the same time, authorizes an impairment of that property right, thus, denying due process. In addition, Plaintiff submits that Section 17-1704.1-B is unconstitutional as applied to him because the School District relied on the statute when the carried out his termination.

In response, the School District argues that this Court has no need to, and must refrain from, addressing the constitutional validity of Section 17-1704.1-B, citing *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944), and *Egolf v. Witmer*, 526 F.3d 104, 109 (3d Cir. 2009), for the proposition that courts should avoid ruling on questions of constitutionality unless such adjudication is unavoidable, such as where the court can reach a decision upon other grounds. In this case, if, as the School District urges, Dr. Mosley does not possess a protectable property interest, or was provided sufficient due process, then there is no need for this Court to pass on Section 17-1704.1-B's validity. If the process provided is determined not to have been legally sufficient, the School District contends then that goes to the issue of the process actually provided and not the statute's validity. Defs.' Opp'n to Pl.'s Untimely Cross-Motion for Summ. J. (Doc. No. 59) at 7.)

---

(citations omitted).

A facial challenge to a legislative act will succeed only if the statute "'is unconstitutional in every conceivable application, or . . . it seeks to prohibit such a broad range of protected conduct that it is constitutionally overbroad.'" *Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) (citing *Hohe v. Casey*, 956 F.2d 399, 404 (3d Cir. 1992) (quoting *Robinson v. New Jersey*, 806 F.2d 442, 446 (3d Cir. 1986))) (internal quotation marks omitted). The court of appeals in *Brown* further explained:

> This standard is consistent with the Supreme Court's declaration in *United States v. Salerno* that a successful facial challenge requires the challenger to "establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). More recently, the Court has suggested that the bar may be slightly lower. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008). Nonetheless, even under the *Washington State Grange* formulation, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Id*. (internal quotation marks omitted); *see McCullen v. Coakley*, 571 F.3d 167, 174 (1st Cir.2009) ("Howsoever worded, this standard imposes a very heavy burden on a party who mounts a facial challenge to a state statute.").

*Brown*, 586 F.3d at 269.[21] In addition, when considering a facial challenge, the Supreme Court has cautioned that such challenges are disfavored for several reasons:

> Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither " 'anticipate a question of constitutional law in advance of the necessity of deciding it' " nor " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688

[21] The Pennsylvania Supreme Court appears to have adopted the "plainly legitimate sweep" standard espoused in *Washington State Grange*, *supra*, in evaluating a facial challenge to a state statute. *Clifton v. Allegheny County*, 969 A.2d 1197, 1222-23 (Pa. 2009).

> (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that " '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion)).

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). Thus, "[i]n determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

While Section 17-1704.1-B(a) provides that a superintendent can recommend the dismissal of a management employee only for cause, subsection (c) appears to eliminate the due process previously afforded such employees. In this regard, Section 17-1704.1-B(c) provides:

> The action of the board of school directors in dismissing an employe under this article shall not be deemed an adjudication under 2 Pa. C.S. Ch. 5 Subch. A (relating to practice and procedure of Commonwealth agencies),[22] nor shall it be subject to a hearing under section 514, 1125.1 or 1122. [23]

24 Pa. Stat. Ann. § 17-1704.1-B(c) (footnote omitted). An "adjudication" is defined under the Local Agency Law as "[a]ny final order, decree, decision, determination or ruling by an agency

[22] 2 Pa. Cons. Stat. Ann. §§ 501 *et seq.*

[23] Neither Section 11-1125.1 nor Section 11-1122 applies to Dr. Mosley. Section 11-1125.1 addresses *suspensions* involving *professional* employees, and states that a suspension ordered under that section shall be considered an adjudication within the meaning of the Local Agency Law, 2 Pa. Cons. Stat. Ann. §§ 551 *et seq.* & § 751 *et seq.* 24 Pa. Stat. Ann. 11-1125.1(f). Section 11-1122, in essence, delineates the valid causes for termination of a contract with a *professional* employee. 24 Pa. Stat. Ann. § 11-1122(a).

affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa. Cons. Stat. Ann. § 101. Section 504 provides, in relevant part, that "[n]o adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa. Cons. Stat. Ann. § 504.

Section 5-514 provides in relevant part:

> The board of school directors in any school district . . . shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct.

24 Pa. Stat. Ann. § 5-514. This provision covers all employees of public school districts not otherwise covered in another section of the public school code, and thus, is commonly referred to as the "catch-all" provision. *DeSimone v. Coatesville Area Sch. Dist.,* 248 F.Supp. 2d 387, 392 (E.D.Pa. 2003). Thus, Section 5-514 appears to apply to management employees such as Dr. Mosley.

By providing that the decision of the school board to terminate a management employee is not an adjudication in Section 17-1704.1-B(c), the Pennsylvania legislature has attempted to eliminate a statutory expectation of continued employment, thus eliminating a protected property interest. The flaw in the legislature's action is that it did not eliminate the language in subsection (a) which effectively requires termination for cause,[24] nor did it amend or repeal Section 5-514.

---

[24] The legislative history behind H.B. 842 indicates that as originally drafted, Section 17-1704.1-B(c) provided for notice and a hearing that complied with Section 514 and 2 Pa. C.S. Ch. 5 Subch. B (relating to practice and procedure of local agencies). *See* Pa. Sen., H.B. 842, 191st Gen. Assembly, Reg. Sess., No. 50 of 2007, at 836 (June 29, 2007). Although the final version of the bill eliminated the notice and hearing procedure in subsection (c), the legislature did not concomitantly eliminate the property interest conferred in subsection (a).

As the Supreme Court stated in *Loudermill*, "'[w]hile the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'" 470 U.S. at 541 (citations omitted). Because the plain language of Section 17-1704.1-B(a) confers a property interest in continued employment, as management employees may only be recommended for cause, the legislature's elimination of due process in subsection (c) runs afoul of the mandate in *Loudermill*, and thus, is constitutionally infirm.

The question then becomes whether Section 17-1704.1-B is unconstitutional on its face or unconstitutional as applied to Dr. Mosley. In determining whether the statute is unconstitutional on its face, the commonwealth court's decision in *Sergi v. School District of the City of Pittsburgh*, 368 A.2d 1359 (Pa. Commw. 1977), is instructive. In *Sergi*, a nonprofessional employee held the position of associate director of personnel ("personnel director") and was informed that his position was being eliminated for budgetary reasons three days prior to termination. The personnel director claimed he was entitled to, but did not receive, a hearing as required under the provisions of the Local Agency Law, now codified at 2 Pa. Cons. Stat. Ann. § 551 *et seq*. *Sergi*, 368 A.2d at 1360. In analyzing his argument, the commonwealth court noted initially that the Local Agency Law implements the requirement in Section 9 of Article V of the Pennsylvania Constitution of 1968 that an adjudication by a local agency shall not be valid unless the party affected has been given reasonable notice of a hearing and an opportunity to be heard. *Id.* at 1360-61. However, the commonwealth court also emphasized that the term adjudication refers to a final decision by a local agency affecting, *inter alia*, property rights, and therefore, found that the personnel director would only be entitled to the process required under the Local Agency Law if he had an enforceable expectation of continued

employment guaranteed either by statute or contract, *i.e.*, a constitutionally protected property interest. *Id.* at 1361.

As to the statutory guarantee, the court turned to 24 Pa. Stat. Ann. § 5-514, which provides nonprofessional employees with limited statutory protection from dismissal, *i.e.*, adequate notice and an opportunity for a hearing is required before terminating a nonprofessional employee where the termination is based on "incompetency, intemperance, neglect of duty, violation of Commonwealth school laws or other improper conduct." *Id.* Because the statute did not specifically include reasons of economy as a basis of dismissal for which due process was required, the court concluded a statutory basis creating an expectation of continued employment in the position of personnel director did not exist where dismissal was predicated on reasons of economy. *Id.* at 1361-62.

Moreover, the court found that the record did not contain any evidence of a contract giving rise to a property interest. Given the lack of a statutory or contractual basis conferring a property right, the commonwealth court held that the personnel director's termination for budgetary reasons was not an adjudication as defined by the Local Agency Law, and therefore, he was not entitled to a hearing under that law. *Id.* at 1362.

Although *Sergi* demonstrates that conceivable situations do exist where a management employee would not have an expectation of continued employment, *i.e.*, for reasons of economy, the elimination of due process in subsection (c) of Section 17-1704.1-B applies only to a recommendation of dismissal of a management employee by the superintendent based on unsatisfactory performance or willful misconduct, both of which are protected under Section 5-514. Therefore, the Court cannot conceive of any application of Section 17-1704.1-B that would not violate the Due Process Clause. Accordingly, the Court will enter a declaratory judgment

that Section 17-1704.1-B is unconstitutionally void.[25]

The Court also finds that Section 17-1704.1-B is unconstitutional as applied to Dr. Mosley. As discussed in Part 2 above, Dr. Mosley's termination was done without affording him meaningful notice and a meaningful opportunity to be heard based on Section 17-1704.1-B. Therefore, Section 17-1704.1-B is also unconstitutional as applied, for the same reasons set forth in Part 2 above.

**B. The Whistleblower Claim**

The School District has also moved for summary judgment on Dr. Mosley's claim of retaliatory discharge under the Pennsylvania Whistleblower Law, Act of December 12, 1986, P.L. 1559, 43 Pa. Stat. Ann. §§ 1421-1428, in Count VI of his Third Amended Complaint. In support, the School District advances the argument that Plaintiff has failed to establish a *prima facie* case of a violation of the Whistleblower Law.

In order to establish a *prima facie* case under the Whistleblower Law, Dr. Mosley must prove "by a preponderance of the evidence that, prior to the alleged reprisal, the employee . . . had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority." 43 Pa. Stat. Ann. § 1424(b). In addition, the employee "must come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001) (citing G*olaschevsky v. Dep't of Envt'l Prot.*, 720 A.2d 757, 759 (Pa. 1998)). Once the employee makes out a *prima facie* case, the burden then shifts to the employer to show that the employee was terminated for "separate and legitimate reasons, which are not

[25] Nonetheless, this finding will have minimal impact since the statute has already expired as of December 31, 2009.

merely pretextual." 43 Pa. Stat. Ann. § 1424(c).

The School District contends that Dr. Mosley has failed to establish his *prima facie* case in two respects: (1) He did not file a "report" as defined under the Whistleblower Law; and (2) he has failed to establish a causal connection between his "report" and his termination. Alternatively, the School District argues that even if Plaintiff has met his burden, it would have taken the same adverse employment action absent Plaintiff's alleged good-faith reporting of wrongdoing because it based his termination upon his unsatisfactory performance.

In response, Dr. Mosley submits that his Whistleblower claim raises issues of fact and credibility disputes which may not be resolved in at the summary judgment stage. Specifically, Plaintiff submits that the School District's two contentions—that the evidence does not support the conclusion that he made a "good faith report" of wrong doing, and that even if he did, the motivation behind Chester's decision to terminate him was based upon chronic, poor work performance—would require this Court to draw inferences from conflicting evidence, resolve issues of credibility, and in substance, make factual determinations that are inappropriately addressed on summary judgment.

After reviewing the applicable law and record evidence, the Court finds that Dr. Mosley has failed to establish a *prima facie* case under the Whistleblower Law. The Whistleblower Law provides in relevant part:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa. Stat. Ann. § 1423(a). For purposes of the Whistleblower Law, "good faith report" is

defined as a "report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." 43 Pa. Stat. Ann. § 1422. "Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." *Id.* "Waste" is defined as an "employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.*

As a preliminary matter, the Court assumes without deciding for purposes of summary judgment that the failure to complete the criminal/background checks in a timely manner potentially implicates a violation of Pennsylvania law, which is designed to protect the public interest, and thus the "wrongdoing" requirement of the Whistleblower Law has been met. The Court also assumes for summary judgment purposes that Plaintiff's March 19, 2007 Memorandum ("Plaintiff's memorandum") in response to Chester's March 6, 2007 Memorandum ("Chester's memorandum"), and his discussion with Chester sometime in March of 2007, constitute a "report" of wrongdoing. Nonetheless, the Court concludes that the record does not support a finding that the "report" was made in "good faith."

The definition of report contained in Section 1422 requires, among other things, that the report be made "without malice or consideration of personal benefit," *i.e.,* in good faith. Even when viewed in the light most favorable to Plaintiff, the overwhelming evidence shows that Plaintiff's memorandum was made in consideration of his own personal benefit. It is clear from a review of Plaintiff's memorandum that he was responding directly to the allegations contained

in Chester's memorandum, and was primarily concerned with defending himself from the criticisms articulated in Chester's memorandum. This conclusion is buttressed by Plaintiff's own words in the March 19th Memorandum. The subject line of the Plaintiff's memorandum reads: "Rebuttal to March 6, 2007 memo placed in my personnel file." (Pl.'s Dep. Ex. 13.) Plaintiff's memorandum also attempts to demonstrate that the "established timeframe" for conducting background checks was not as fixed and uniform as Chester believed. Plaintiff further states that *he* was being unjustly criticized, and suggests that the individuals who were responsible for conducting the background checks for Chester and Superintendent Roosevelt, which also were not done in a timely fashion, may not have received written criticisms, as had he.

Noticeably absent from Plaintiff's memorandum is any mention of an alleged violation of Pennsylvania law or that he was concerned with the impact of the wrongdoing on the students or School District, or that he wanted this information disseminated to others.[26] Indeed, Plaintiff stated that he did not want to escalate the matter further, but just wanted to be treated fairly, and only suggested that his March 19th letter be placed only in his personnel file. These words do not evidence an intent to make anyone in the School District who was interested aware of the alleged wrongdoing. Clearly, Plaintiff's remarks demonstrate his concern and belief that *he* was being treated unfairly, not that a significant violation of state law was occurring. A reasonable jury could not find otherwise.

Plaintiff's deposition testimony further supports this conclusion:

A. . . . May I go back to the February 22?

---

[26] Plaintiff's March 19th Memorandum is addressed only to Mr. Chester and suggests that the memorandum be placed only in his personnel file, where no one else would see it, unless they had access to, and a reason for reviewing, his personnel file.

Q. Sure.
A. Apparently when we went through this in this process, and as I explained to Mr. Chester what had occurred seemed to be okay with what had happened and didn't seem to be really any issue on my part. But then I received this March 6. It was totally contrary to the conversation that we had had. And I really viewed it as putting the blame directly on me.

And then I generated this letter, and I had did some additional research, because again there was an issue of clarification. Quite frankly the hiring and the reviews and the checks specifically for administrators had always been up to the chief human resources officer to do.

So I did some additional research above and beyond the individuals that was in my February 22 memorandum and discovered that Mr. Chester and the superintendent hadn't had a reference check. And I did that for a couple of reasons.

Number one, to let them know I was being blamed. And there's been some inconsistencies here. And it really wasn't my responsibility on an ongoing basis, and I was being blamed. I was just saying, "Hey, it's part of a fairness issue here to look at. You haven't gotten a security clearance and the superintendent hadn't and there were some others that hadn't as well. And there's been no issue addressed with them. There were other people that had that responsibility."

So I'm being blamed with the issue on McCrea. He didn't seem to feel there was an issue with it before. And then when I brought it to his attention that there were others that were there, so we could clear that up so there wouldn't be any issues going forward, he wrote this memorandum. I thought it was a retaliation. So I thought I needed to respond to him with his particular memorandum.

. . .

Q. If you had found out about [Chester] and Roosevelt, and you said that there were others, and we'll get to those, if you knew about that in February, you would have told Jody—
A. I didn't know it at this time. This was very specific. This was only looking at specific people that fell within this classification. And then he was critical. So I said, "Let me look at others that I didn't have responsibility for that were done." And we hired on people to see where they were at.

Plus, I wanted to make sure from an auditing standpoint if there were things that weren't in place and if they're saying that I'm accountable and being critical, that I need to put in place systems to make sure that didn't happen in the future.

Again, that's what prompted that. I just felt very, I just thought it was very unfair the way that that was handled.

(Mosley Dep. at 47-49.)

Plaintiff argues that an issue of fact exists regarding whether his report was made in good faith, based on a "contradictory account of his purpose" contained in his second revised affidavit, filed in support of his opposition to Defendants' summary judgment motion. In particular, Plaintiff asserts, in his affidavit, that in writing the memorandum, he wanted to make known that:

> there was a relatively widespread practice of not assiduously complying with legal requirements relative to timely obtaining completed criminal/background clearance forms and placing them in personnel files . . . [and that he] wanted to make this known not only to Mr. Chester but to anyone else in the School District who would be interested.

Pl.'s Second Revised Aff., ¶ 32 (Doc. No. 82). However, Plaintiff's self-serving allegations in his affidavit do not create an issue of fact as to whether the report was made in "good faith." While the Court is cognizant of the fact that in deciding a motion for summary judgment "it is not the role of the trial judge 'to weigh the evidence and determine the truth of the matter," neither may a plaintiff "manufacture an issue of disputed fact by relying 'upon mere allegations, general denials, or [ ] vague statements.'" *Stiles v. Synchronoss Tech., Inc.*, Civ. A. No. 07-CV-1923, 2008 WL 3540483, *3 (E.D.Pa. Aug. 12, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), and *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gasses*, 283 F.3d 595, 608 (3d Cir. 2002); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985)).

Here, Dr. Mosley's reliance on nothing but his own self-serving assertions about his purpose in making the report does not create a material issue of fact in light of the undisputed

documentary record evidence submitted by the School District and Dr. Mosley's own deposition. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiffs]"). See also *Nationwide Mut. Ins. Co. v. Roth*, 252 F. App'x 505, 508 (3d Cir. 2007) (holding plaintiff could not rely on his self-serving affidavit to avoid summary judgment where the overwhelming documentary record evidence supported a contrary conclusion) (citing *Blair*, 283 F.3d at 608) (other citation omitted). Accordingly, the Court finds Plaintiff has failed to establish that he made a "good faith report" as required by the Whistleblower Law, and a reasonable jury could not find otherwise.[27]

Next, the School District contends that Plaintiff has failed to establish a causal connection between his report of wrongdoing in March of 2007 and his termination on August 23, 2007. In support, the School District submits that Dr. Mosley cannot proffer any evidence to suggest that his termination from the School District was related in any way to his March 19th Memorandum. Plaintiff completely fails to address the School District's argument.

In order to establish a causal connection under the Whistleblower Law, the employee must "show by concrete facts or surrounding circumstances that the report led to [his] dismissal, such as that there was specific direction or information [he] received not to file the report or there would be adverse consequences because the report was filed." *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994), *aff'd per curiam,* 669 A.2d 335 (Pa. 1995). Here, there is no

---

[27] Plaintiff also attempts to create a material issue of fact as to whether his report was made in good faith by arguing that Chester's reaction to his March 19th Memorandum is disputed. Plaintiff's argument misses the mark. Although an issue of fact does exist regarding Chester's reaction to Plaintiff's memorandum, that goes to Defendants' burden, once the burden shifts, to show that a separate and legitimate reason exists for Plaintiff's termination, a question the Court need not reach because Plaintiff has failed to establish a *prima facie* case under the Whistleblower Law.

evidence in the record showing that Chester ever threatened to terminate Plaintiff or impose adverse consequences on him *because of his March 19th Memorandum*.

Although there is some dispute about Chester's reaction to Plaintiff's memorandum,[28] there is no evidence from which a reasonable jury could infer that Chester decided to terminate Plaintiff because of his "report." Chester's reaction, even if irate, without evidence of some threat or act to impose adverse consequences on Plaintiff because of his report, does not create a factual issue. Plaintiff's *belief* that Chester began to set the stage to terminate him as of early March 2007 when he confronted Chester with the fact that his personnel file did not contain the necessary criminal/background clearance forms (*see* Pl.'s Resp. Concise Stmt., ¶ 63), is not alone sufficient to withstand summary judgment. In any event, Plaintiff admitted in June of 2007 that Chester informed him that his job was not in jeopardy at a meeting with Vince Carr, Plaintiff and Chester. (Pl.'s Dep. at 195.)

Moreover, Plaintiff's suggestion that Chester admitted that he considered terminating his employment as early as March 2007 (Pl.'s Resp. Concise Stmt., ¶ 63), is neither supported by the record nor sufficient to show a causal link between the March 19th Memorandum and his termination. A review of the record reveals that Chester testified he began to strongly consider that a change had to be made based on the "mistake filled zz-all Summer Job Posting date announcement" handled by Plaintiff's department, as indicated in an email to Plaintiff on March 16, 2007. (Chester Dep. at 106-07; Pl.'s Dep. Ex. 14.) Chester's concern about the overall performance of the Recruiting and Staffing Department, as evidenced in his March 16th email, occurred three days prior to both Plaintiff's March 19th Memorandum. Thus, even giving Plaintiff the benefit of the inference that the "change" Chester was considering on March 16th

[28] Plaintiff contends Chester became visibly irate, while Chester maintains that he did not and

was Plaintiff's termination, it is clear that this "change" could not have been based on the March 19th Memorandum.

Nor is there any evidence to suggest a causal link between Plaintiff's March 19th Memorandum and the Board's vote to terminate his employment on August 22, 2007. Plaintiff admits that Chester never informed the Superintendent or the Board about Plaintiff's March 19th Memorandum, nor did Chester place a copy of Plaintiff's memorandum in his personnel file. (Defs.' Stmt. of Material Undisputed Facts, ¶ 46; Pl.'s Resp. Concise Stmt., ¶ 46.)

In addition, a causal connection cannot be inferred solely through the passage of time. Here Plaintiff's termination occurred some five months after he made his report of wrongdoing. Courts have rejected an employee's temporal proximity argument in situations where the intervening period of time was less than the five-month period at issue here. *See, e.g., Gray*, 651 A.2d at 225 (holding that complaint that merely alleges passage of four months between report and termination was insufficient to establish causal connection); *Golaschevsky v. Commonweath*, 683 A.2d 1299, 1304 & n. 10 (Pa. Commw. Ct. 1996) (rejecting argument that causal connection can be inferred solely from the passage of time where time between the alleged report and retaliatory act was approximately four months) (citing *Gray, supra*) *aff'd* 720 A.2d 757 (Pa. 1998); *Lutz v. Springettsbury Twp.*, 667 A.2d 251, 254 (Pa. Commw. Ct. 1995) (rejecting argument that mere fact that employee was terminated some time after his report established nexus between the two). Plaintiff's termination, coming five months after his March 19th Memorandum, is simply too remote to infer a causal connection.

Thus, having found no evidentiary or legal basis to suggest a causal connection between the report and termination, the Court finds Plaintiff has failed to prove the causation element of

---

instead thanked Plaintiff for bringing the matter to his attention.

his Whistleblower Law claim.

For the reasons set forth above, the Court finds Plaintiff has failed to establish a *prima facie* case under the Whistlerblower Law. Therefore, the Court will grant Defendants' motion for summary judgment on this claim.[29]

## IV. CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part the School District's motion for summary judgment. The Court will grant the School District's motion with regard to Plaintiff's claim under the Pennsylvania Whistleblower Law (Count VI), and will deny the School District's motion in all other respects. In addition, the Court will grant Plaintiff's motion for partial summary judgment on Counts III and IV, will vacate the Board's action approving the Superintendent's recommendation to terminate Plaintiff, and will remand to the Board for an appropriate hearing after receiving due notice thereof. The Court will also enter a declaratory judgment declaring 24 Pa. Stat. Ann. § 17-1704.1-B unconstitutional on its face and

[29] Because Plaintiff has failed to meet his burden, the burden does not shift to the School District to prove it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing. If the burden had shifted, issues of fact exist, however, regarding whether Plaintiff's performance was unsatisfactory, which would preclude a finding in favor of the School District on its defense to the Whistleblower claim.

In addition, although not raised by the parties, it appears that Plaintiff's claim under the Whistleblower Law is time-barred. Section 1424(a) provides that a civil action alleging a violation under the Whistleblower Law may be brought within 180 days after the occurrence of the alleged violation. 43 Pa. Stat. Ann. § 1424(a). Despite the use of the permissive "may," Pennsylvania courts have held the 180-day time limitation for commencing a Whistleblower action is mandatory and the courts lack the discretion to extend it. *O'Rourke v. Pa. Dep't of Corrections*, 730 A.2d 1039, 1042 (Pa. Commw. Ct. 1999) (citing *Perry v. Tioga County*, 649 A.2d 186, 188 (Pa. Commw. Ct. 1994)). Plaintiff first asserted his claim under the Whistleblower Law in his Third Amended Complaint filed on August 18, 2008, almost one year after his termination. In addition, the conduct supporting Plaintiff's Whistleblower claim is asserted for the first time in sixteen new paragraphs (¶¶ 10-25) in his Third Amended Complaint. Thus, the relation back rule under Rule 15(c)(1) of the Federal Rules of Civil Procedure would not make his Whistleblower claim timely.

as applied to Dr. Mosley.

Dated: March 29, 2010

By the Court:

LISA PUPO LENIHAN
United States Magistrate Judge

cc: All Counsel of Record
*Via Electronic Mail*